# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| AARON BELL, | ) | No. 69438-3-I |
| Appellant, | ) ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF LABOR AND INDUSTRIES, | ) ) ) ) | |
| Respondents. | ) | FILED: December 16, 2013 |

GROSSE, J. — When, as here, substantial evidence supports the Board of Industrial Insurance Appeals' conclusion that a worker failed to show that his employment aggravated a preexisting injury so as to result in a new disability, the trial court correctly affirmed the Department of Labor and Industries' rejection of the worker's claim for benefits. Accordingly, we affirm.

## FACTS

Aaron Bell has worked as a drywaller for over 24 years and has a long history of back problems. He first sustained an industrial injury to his lower back on August 1, 1991, for which he filed a workers' compensation claim. The claim was allowed and was closed in 1993. He received a permanent partial disability award equal to Category 2 lumbar spine.[1]

In 1998, he injured his lower back again and filed another claim which was allowed. On October 25, 1999, he had surgery. On February 5, 2001, he had another surgery. In March 2001, an independent medical examiner rated Bell's impairment as

---

[1] See WAC 296-20-280(2).

being equal to Category 3 lumbar spine. It is unclear when this claim was closed.

In November 2002, Bell sustained a third injury to his lower back. He again filed a claim which the Department of Labor and Industries' (Department) allowed. From November 2002 through September 2006, Bell did not perform drywalling work.

In August 2004, Dr. Jeff Summe began treating Bell. Bell consistently complained of back pain at visits to Dr. Summe between 2004 and 2006. In October 2004, Dr. Sanford Wright performed surgery on Bell's lumbar spine between the fifth lumbar vertebra (L5) and first sacral vertebra (S1) on the right side. This was covered by the 2002 claim, which remained open.

In 2005, a physical capabilities evaluation determined that Bell was incapable of returning to work as a drywall applicator. Bell was then retrained as a loan officer. In July 2006, Bell worked briefly as a loan officer but quit for financial reasons. In September 2006, he returned to drywall work because he needed to make more money.

On August 25, 2008, Bell saw Dr. James Lusk complaining of chronic lower back pain and increased lower back pain following being on a ride at a fair. Dr. Lusk believed he had a strain but did not feel he had a radiculopathy. On April 3, 2009, Bell saw Dr. Alan Li and reported increasing problems with back pain about a month before.

On May 20, 2009, Bell again visited Dr. Summe about his lower back pain. Dr. Summe believed that this lower back condition was related to the November 2002 work injury and treated him under that claim. Dr. Summe's examination revealed moderate muscle spasming through the lumbar region and positive straight leg raising on the right.

On May 29, 2009, Bell had an MRI (magnetic resonance imaging) scan. Dr.

Summe compared this MRI to one taken in August 2004. The latest MRI showed progressive narrowing of the L5-S2 intervertebral disc space with continued right foraminal disc protrusion. Dr. Summe referred Bell to Dr. Sanford Wright, the neurosurgeon who had performed surgery on Bell back in 2004.

In June 2009, Bell was laid off due to lack of available work. On August 3, 2009, Bell filed another claim based on his last visit to Dr. Summe. On August 5, 2009, at the request of the Department, Dr. William Stump, a neurologist, examined Bell and reviewed his medical records.

Dr. Stump believed that Bell had a recurrent disc herniation at L5-S1 on the right that was accounting for the findings he observed on examination. He thought there were multiple causes for this condition, including Bell's base-line genetics, prior industrial injuries that created change in his lumbar spine, and a new incident in 2002 that led to surgery followed by progressive symptoms in 2009, which led to the identification of disc abnormalities at L4-5 and L5-S1 that were greater than previously observed.

On August 25, 2009, the Department rejected Bell's claim for lack of proof of a specific injury at a definite time and place in the course of employment. Bell filed a protest of the order and on September 14, 2009, the Department issued an order affirming the August 25, 2009 rejection of his claim. Bell then appealed to the Board of Industrial Insurance Appeals (Board). On November 23, 2010, the industrial appeals judge issued a proposed decision and order (PD&O) affirming the Department's rejection order. Bell filed a petition for review of the PD&O, which was denied by the Board. Bell then appealed to the Snohomish County Superior Court. After a bench

trial, during which the superior court considered the testimony of Dr. Stump, Dr. Wright, and Dr. Summe, the court affirmed the Department's rejection order. Bell appeals from the superior court's order.

## ANALYSIS

Bell contends that the superior court erred by affirming the Department's order because the preponderance of the evidence supports his claim that his return to drywall work proximately caused an aggravation of his back condition. We disagree.

The Board's decision is prima facie correct and a party attacking the decision must support its challenge by a preponderance of the evidence.[2] The superior court reviews the Board's decision de novo.[3] We review the Board's record "to see whether substantial evidence supports the findings made after the superior court's de novo review, and whether the court's conclusions of law flow from the findings."[4] Evidence is substantial if "sufficient to persuade a fair-minded, rational person of the truth of the matter."[5]

The Industrial Insurance Act, Title 51 RCW, should be construed liberally in favor of injured workers.[6] But the burden remains on the worker claiming entitlement to disability benefits for an occupational disease to prove that "the disabling condition arose naturally and proximately out of employment."[7] Such a worker is entitled to benefits when the employment either causes a disabling disease, or aggravates a

---

[2] Ruse v. Dep't of Labor & Indus., 138 Wn.2d 1, 5, 977 P.2d 570 (1999).
[3] RCW 51.52.115.
[4] Ruse, 138 Wn.2d at 5-6 (quoting Young v. Dep't of Labor & Indus., 81 Wn. App. 123, 128, 913 P.2d 402 (1996)).
[5] R & G Probst v. Dep't of Labor & Indus., 121 Wn. App. 288, 293, 88 P.3d 413, review denied, 152 Wn.2d 1034, 103 P.3d 201 (2004).
[6] Dennis v. Dep't of Labor & Indus., 109 Wn.2d 467, 470, 745 P.2d 1295 (1987).
[7] Ruse, 138 Wn.2d at 6 (citing Dennis, 109 Wn.2d at 481).

preexisting disease so as to result in a new disability.[8] "In an aggravation case, the employment does not cause the disease, but it causes the disability because the employment conditions accelerate the preexisting disease to result in the disability."[9] Thus, the disability is caused by the employment in an aggravation case.[10]

In a disability claim premised on aggravation of a preexisting disease, "[t]he worker must prove a condition of the job 'more probably than not' caused the disability, . . . and the disability 'came about as a matter of course as a natural consequence or incident of distinctive conditions of his or her particular employment.'"[11] "The 'more probably than not' causation standard requires a showing that, but for the aggravating condition of the job, the claimed disability would not have arisen."[12]

Here, the Board concluded:

> In Mr. Bell's case the evidence is that the disability was caused by the 2002 industrial injury which acted upon Mr. Bell's prior injuries and genetic makeup. His return to work did not create a new disability; it was present and active and covered by an open Department claim. The requirement in Ruse is logical since a person's work conditions would not cause a preexisting symptomatic disease; they could only aggravate it to a point where the worker is in some way disabled. This is not the fact pattern in this appeal. Mr. Bell had both the preexisting disease and disability and it probably would have naturally progressed even without his return to drywalling. This is the opinion of all the doctors and due to this fact the Department order should be affirmed.

The Board also found that the record did not support Bell's position that "but for his return to drywalling in 2006 and his continuing to work through June 2009 he would not have had the worsening of his preexisting low back condition for which he began to

---

[8] Ruse, 138 Wn.2d at 7.
[9] Ruse, 138 Wn.2d at 7 (emphasis omitted).
[10] Ruse, 138 Wn.2d at 7.
[11] Ruse, 138 Wn.2d at 7 (quoting Dennis, 109 Wn.2d at 477).
[12] Ruse, 138 Wn.2d at 7 (emphasis omitted) (quoting Dennis, 109 Wn.2d at 477).

seek treatment in 2008 with Dr. Lusk." As the Board found:

> There is no dispute that Mr. Bell has had low back problems since at least August 1991. He has had four surgeries and was actually retrained by the Department to do lighter work but returned to drywalling. All the doctors agree that Mr. Bell's work as a drywaller contributed to the worsening of his condition but when he left drywalling in 2009 he was laid off and did not quit due to his physical condition though his symptoms did increase around the same time. He told Dr. Lusk that the increased problems were due to a ride at a fair rather than his work duties. As can be seen by the testimony of Drs. Summe and Wright, even though they knew Mr. Bell's work history and the type of work he did they related the need for treatment beginning in 2009 to the 2002 industrial injury.
>
> Mr. Bell testified that he always had some back pain. . . . He told Dr. Stump that he had continual low back symptoms to varying degrees since his first injury. Both Dr. Summe and Dr. Wright assumed the need for treatment in 2009 was due to the 2002 injury and Dr. Summe first provided treatment under that claim number until he helped Mr. Bell file his occupational disease claim. . . . Exhibit No. 8 which was signed by Mr. Bell on December 16, 2009, shows that he stated that the date his condition began was 2002. When asked about filing the occupational disease claim Dr. Summe stated that ". . . it was definitely an ongoing aggravation of his prior L&I claim."
>
> Dr. Wright, who also began treating Bell in 2009 under the Y-claim [(2002 claim)], thought that Mr. Bell's condition was related to the 2002 injury. . . . He testified that based on Bell's history it was likely that the progressive worsening found on the 2004 and 2009 MRI's [sic] was a progression of the preexisting condition. . . . He also stated that Mr. Bell's condition was probably going to worsen over time regardless of his daily living or work activities when considering his prior injuries. . . . The discharge summary of the January 2010 surgery specifically indicated that Mr. Bell's condition was related to the 2002 industrial injury.

The superior court affirmed, finding that "[t]he distinctive conditions of Mr. Bell's work as a drywaller between 2006 and 2009 did not proximately cause an aggravation of his preexisting low back condition nor did they proximately cause any new low back condition." The court concluded that "Bell did not sustain an occupational disease within the meaning of RCW 51.08.140 that arose naturally and proximately from his employment as a drywaller between 2006 and 2009," and that "[t]he Board's January 18, 2011 order that adopted the November 23, 2010 [PD&O] is correct and is affirmed."

Bell argues that the superior court erred by affirming the Board because the preponderance of the evidence supports his claim, pointing to Dr. Summe's and Dr. Wright's testimony that his return to drywall work aggravated his low back condition. But as the Department correctly notes, we do not reweigh the evidence on review; rather, we determine only if substantial evidence supports the Board's findings. As the citations to the record demonstrate, these findings were supported by substantial evidence.

While Dr. Summe and Dr. Wright did ultimately opine that Bell's return to work aggravated his condition, their other testimony supports the Board's findings and conclusions as set forth above. And as the Department contends, none of their testimony identified any new disability that resulted from his return to work. Rather, Dr. Summe testified that the condition for which Bell was treated in May and June 2009 under the 2002 injury claim looked "[o]bjectively . . . the same" as the condition for which he filed the July 2009 claim, and that the objective findings present in his low back in September 2006, before his return to work, were "fairly close" to the objective findings present in May 2009. Dr. Wright also testified that it was his understanding that the condition for which he treated Bell in November 2009 was the low back condition covered by the 2002 injury claim.

Bell further contends that the Board failed to give special consideration to his attending physician, as is required in such cases.[13] But as the Department notes, giving special consideration does not necessarily mean giving greater weight or credibility.[14] Here, the Board did thoroughly consider the testimony of Dr. Summe and relied on it in

---

[13] See Hamilton v. Dep't of Labor & Indus., 111 Wn.2d 569, 570, 761 P.2d 618 (1988).
[14] See Hamilton, 111 Wn.2d at 572.

part to support its ruling.

Finally, Bell contends that the superior court's findings and conclusions are inadequate under the standards set forth in Groff v. Department of Labor and Industries.[15] In Groff, neither the Board nor the superior court made any written analysis of the evidence in a lengthy record of an appeal of a denial of benefits for a disabling pulmonary condition a worker claimed was caused by exposure to fumes at his workplace.[16] Rather, "[t]he Board contented itself with" a "brief five-line summary of the critical issue,"[17] and the superior court made a similar cursory finding that the Board correctly construed the law and found the facts and that the plaintiff failed to produce evidence sufficient to preponderate against the Board's findings.[18] As a result, there were no substantive findings and conclusions to review, thereby preventing effective appellate review of the factual issues.[19] Accordingly, the court remanded back to the superior court to enter sufficient findings that indicate the factual bases for the ultimate conclusion, including why it disbelieved testimony of the treating physician and what, if anything, was the more likely cause of the worker's condition.[20]

Here, the superior court's findings were admittedly limited and conclusory. But unlike in Groff, the Board here entered findings and conclusions along with a detailed analysis of its conclusion and the evidence in support of it. Thus, the superior court's conclusion that the Board's findings and conclusions were correct could be adequately reviewed by examining the Board's findings. As discussed above, these were

---

[15] 65 Wn.2d 35, 395 P.2d 633 (1964).
[16] 65 Wn.2d at 36.
[17] Groff, 65 Wn.2d at 37.
[18] Groff, 65 Wn.2d at 38-39.
[19] Groff, 65 Wn.2d at 39.
[20] Groff, 65 Wn.2d at 40, 46.

supported by substantial evidence and supported the conclusion that Bell failed to show that his return to work proximately caused an aggravation of his preexisting injury so as to disable him.

We affirm.

WE CONCUR: