# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| IAN CARLSON, | No. 59469-2-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| TRADESMEN INTERNATIONAL LLC, and DEPARTMENT OF LABOR AND INDUSTRIES OF THE STATE OF WASHINGTON, | |
| Respondents. | |

CHE, J. — Ian Carlson appeals the superior court's order affirming a Board of Industrial Insurance Appeals (BIIA) decision that the Department of Labor and Industries (DLI) properly calculated Carlson's wage rate.

Carlson sustained an injury while in the course of employment with Tradesmen International, a construction staffing organization. DLI accepted Carlson's industrial injury claim and calculated his wage rate based on his average hours of work per month over the six-month period preceding his injury. Carlson appealed to BIIA, which affirmed DLI's order. Carlson then appealed BIIA's decision to the superior court. The superior court affirmed BIIA's decision.

Carlson argues that DLI should have calculated his monthly wage based on RCW 51.08.178(1)(e) assuming "full-time" work based on 8 hours per day and 5 days per week instead of averaging his hours worked because RCW 51.08.178(1) is ambiguous, and Title 51 RCW

No. 59469-2-II

should be liberally construed in favor of the worker under RCW 51.12.010. Carlson requests attorney fees and costs on appeal.

We hold that under RCW 51.08.178(1), DLI had discretionary authority to average Carlson's hours to compute his wage rate. Accordingly, we affirm. We decline to award Carlson attorney fees and costs on appeal.

FACTS

Tradesmen is a construction staffing organization that places skilled trade employees or craftsmen (field employees) on assignments for employers with which it contracts. Field employees are placed in "temporary staffing relationship[s]" with Tradesmen's clients but are employed by Tradesmen, which pays their wages. CP at 228. Field employees do not enter into contracts with Tradesmen or its clients. The work is assignment-based, assignments can vary in length and hours, and employees may accept or decline assignments. Tradesmen pays employees for only the hours they work on an assignment.

Carlson had worked for Tradesmen for a short period of time in 2017 but left after finding a different job that provided a 40-hour work week. According to Carlson, a Tradesmen employee then offered Carlson a raise and stated that they wanted to "make sure [Carlson] had 40 hours a week." CP at 204. In 2018, Carlson returned to Tradesmen because he was "promised 40 hours a week." CP at 213. Carlson intended to work 40 hours per week for Tradesmen, and was available for 40 hours per week, but he acknowledged that there were weeks he did not work 40 hours due to children's medical appointments and other reasons. When Carlson finished a job assignment, he would contact Tradesmen, and they would place him on a list for another job assignment. Jobs were typically assigned based on seniority and job availability. Carlson was assigned to various companies lasting one-to-two weeks or longer.

2

Tradesmen considered Carlson a variable hour employee, meaning that he "d[id] not have a set schedule." CP at 238. Upon hiring employees, Tradesmen "cannot determine how many hours [employees will] be working per week, per month, [or] per year . . . [because work] is all assignment based." CP at 238.

On June 25, 2018, Tradesmen assigned Carlson to work with Fairbanks Construction as a carpenter assistant. Tradesmen paid Carlson $22.00 per hour worked.

On December 14, 2018, Carlson sustained an industrial injury in the course of his employment with Tradesmen. Specifically, while on assignment working with Fairbanks, Carlson fell about eight feet from scaffolding and injured his back. DLI accepted Carlson's worker's compensation claim and provided benefits.

In support of wage-related benefits, Carlson contended that he was hired to work 8 hours per day, 5 days per week for a total of 40 hours per week. Whereas Tradesmen contended it was a temporary staffing agency and it did not provide full-time, regular, and continuous work for anyone. Because the parties did not agree on Carlson's wage rate, DLI reviewed Carlson's payroll records. Of Carlson's 24 weekly payroll records while on assignment with Fairbanks, he worked 15 weeks at between 39-40 hours, 1 week at 35.75 hours, 5 weeks at between 31-32 hours, and 3 weeks at between 24-25 hours.

Based on the payroll records, DLI determined Carlson did not work a set schedule, had no set number of hours per week, and his hours varied. Further, DLI determined that Carlson was an RCW 51.08.178 "[s]ub[section] 1, regular and continuous worker," as opposed to a "part time, intermittent, or seasonal worker," and should calculate his wage rate under RCW 51.08.178(1) instead of subsection (2). CP at 261.

3

In November 2020, DLI issued an order calculating Carlson's wage rate based on his average monthly hours worked over the six-month period from June 25, 2018, through December 9, 2018 (144.16 hours per month multiplied by $22.00 per hour), which resulted in a monthly wage of $3,171.52.[1] DLI used a six-month period that "fairly represent[ed]" the hours Carlson worked at the time of his injury because he had been assigned to work with one client, Fairbanks, for that six-month period, and Fairbanks was the assignment he was working at the time of his industrial injury. CP at 257. DLI affirmed the November 2020 wage order in its January 2021 decision, and Carlson timely appealed DLI's decision to BIIA, which affirmed DLI's decision. Carlson then timely appealed BIIA's decision to the superior court.

The superior court affirmed BIIA and entered findings of fact (FF), conclusions of law (CL), and judgment (J.). CP at 314-17. The court found that a preponderance of evidence supported the following findings of fact (FF 1.2): that Carlson did not have a written contract with Tradesmen that guaranteed he would receive a specific number of hours per week (FF 1.2.4); that Tradesmen did not promise Carlson at least 40 hours of work per week, and Carlson "did not work a set number of hours" each day or week (FF 1.2.5); that Carlson's work schedule was assignment-based, and he was not required to accept a job assignment (FF 1.2.6); that at the time of injury, Carlson had worked on an assignment for Fairbanks Construction for six months preceding his injury and worked 24-40 hours per week during that period (FF 1.2.7); and that the

---

[1] DLI had issued a wage order in March 2020 in which it had averaged Carlson's wages over a 12-month period, which was affirmed and then appealed. The November 2020 order corrected and superseded the March 2020 order.

The November 2020 wage order resulted in a higher monthly wage than DLI's initial wage calculation in its March 2020 order.

DLI "calculated his wage rate under RCW 51.08.178(1) in a fair and reasonable manner by averaging his wages over a six-month period because [his] work hours and/or number of work days varied" (FF 1.2.8). CP at 316.

Based on these facts, the superior court concluded that RCW 51.08.178(1) applied (CL 2.2.2) and that DLI's January 2021 order and BIIA's order were correct, and it affirmed the BIIA (CL 2.2.3, 2.3, 2.4, J. 3.1). The superior court ordered Carlson to pay fees and awarded interest to DLI. (J. 3.2, 3.3.)

Carlson appeals and requests attorney costs and fees on appeal.

ANALYSIS

I. WAGE CALCULATIONS UNDER RCW 51.08.178(1)

Carlson argues the superior court erred in determining that under RCW 51.08.178(1), averaging Carlson's hours worked per month was a fair and reasonable calculation for time-loss compensation benefits. DLI responds that RCW 51.08.178(1) unambiguously allows it to average a worker's hours worked per day. We agree with DLI's interpretation of the statute.

A.      *Statutory Interpretation of RCW 51.08.178(1)*

1.  *Legal Principles*

Washington's Industrial Insurance Act (IIA), Title 51 RCW, provides "sure and certain relief for workers, injured in their work," regardless of fault, to the exclusion of other remedies, proceedings, and compensation, and abolishes civil actions and civil causes of action for personal injuries except as otherwise provided in the title.[2] RCW 51.04.010.

---

[2] The passage of state workers' compensation legislation in the early 1900s through which workers gave up the right to sue and recover full tort damages from their employers in exchange for fair compensation and medical benefits without regard to fault is referred to as the "Grand Bargain." Price V. Fishback, *Long-Term Trends Related to the Grand Bargain of Workers'*

"When interpreting IIA statutes, we give great weight to DLI's interpretation of the IIA, and we liberally construe the IIA to achieve the legislature's intent." *Peterson v. Dep't of Lab. & Indus.*, 17 Wn. App. 2d 208, 217, 485 P.3d 338 (2021). The policy of the IIA states "This title shall be liberally construed for the purpose of reducing to a minimum the suffering and economic loss arising from injuries and/or death occurring in the course of employment." RCW 51.12.010.

"The purpose of [workers'] time-loss compensation is to reflect a worker's lost earning capacity." *Double D Hop Ranch v. Sanchez*, 133 Wn.2d 793, 798, 947 P.2d 727, 952 P.2d 590 (1997). RCW 51.08.178(1) provides that compensation rates for time-loss and loss of earning power are determined based on a worker's wage at the time of the injury. *Gallo v. Dep't of Lab. & Indus.*, 155 Wn.2d 470, 481, 120 P.3d 564 (2005). The "monthly wages the worker was receiving from all employment at the time of injury shall be the basis upon which compensation is computed unless otherwise provided specifically in the statute concerned." RCW 51.08.178(1).

Subsection (1) applies where the worker's wages are not fixed by the month; subsection (2) applies where either the worker's employment is exclusively seasonal in nature, or the worker's current employment or their relationship to their employment is essentially part-time or intermittent; and subsection (4) applies where a wage has not been fixed or cannot be reasonably and fairly determined. RCW 51.08.178(1)-(2), (4). Subsection (1) is the "default provision," which must be used to calculate a worker's wages unless DLI establishes it does not apply. *Dep't of Lab. & Ind. v. Avundes*, 140 Wn.2d 282, 290, 996 P.2d 593 (2000); *see also* RCW 51.08.178(1)

---

*Compensation*, 69 RUTGERS UNIV. L. REV. 1185, 1188 (2017). Both employers and workers gained from the bargain—employers "faced reduced uncertainty about jackpot verdicts" and "reduced conflicts with the workforce over accident liability," and workers received higher post-accident benefit payments. *Id.* at 1189.

("[subsection (1) applies] unless otherwise provided specifically in the statute concerned."). The parties do not dispute that subsection (1) applies in this case.

Under subsection (1), the worker's monthly wage is determined by "multiplying the daily wage the worker was receiving at the time of the injury: (a) By five, if the worker was normally employed one day a week; (b) By nine, if the worker was normally employed two days a week; (c) By thirteen, if the worker was normally employed three days a week; (d) By eighteen, if the worker was normally employed four days a week; (e) By twenty-two, if the worker was normally employed five days a week; (f) By twenty-six, if the worker was normally employed six days a week; (g) By thirty, if the worker was normally employed seven days a week." RCW 51.08.178(1).

"The daily wage shall be the hourly wage multiplied by the number of hours the worker is normally employed. The number of hours the worker is normally employed shall be determined by the department in a fair and reasonable manner, which may include averaging the number of hours worked per day." RCW 51.08.178(1).

We review issues of statutory interpretation de novo. *SEIU Healthcare 775NW v. Dep't of Soc. & Health Servs.*, 193 Wn. App. 377, 398, 377 P.3d 214 (2016). When interpreting a statute, our main objective is to determine and give effect to the legislature's intent. *Columbia Riverkeeper v. Port of Vancouver USA*, 188 Wn.2d 421, 435, 395 P.3d 1031 (2017). To determine legislative intent, we look first to the statute's plain language. *Id.* at 432. To determine the statute's plain language, we may consider the language of the provision in question, related provisions, the context of the statute in which we find the provision, and the statutory scheme as a whole. *State v. Evergreen Freedom Found.*, 192 Wn.2d 782, 790, 432 P.3d 805 (2019).

No. 59469-2-II

If the plain language is unambiguous, the analysis ends and we apply the statute's plain language. *Spokane County v. Dep't of Fish & Wildlife*, 192 Wn.2d 453, 458, 430 P.3d 655 (2018). We will not add language to an unambiguous statute even if we believe the legislature intended something different but did not adequately express it. *Am. Cont'l Ins. Co. v. Steen*, 151 Wn.2d 512, 518, 91 P.3d 864 (2004).

Statutory language that is susceptible to more than one reasonable interpretation is considered ambiguous. *Cockle v. Dep't of Lab. & Indus.*, 142 Wn.2d 801, 808, 16 P.3d 583 (2001). "'[W]here reasonable minds can differ over what Title 51 RCW provisions mean, in keeping with the legislation's fundamental purpose, the benefit of the doubt belongs to the injured worker.'" *Dep't of Labor & Indus. v. Granger*, 159 Wn.2d 752, 757, 153 P.3d 839 (2007) (quoting *Cockle*, 142 Wn.2d at 811). However, a statute is not ambiguous simply because other possible interpretations exist. *Steen*, 151 Wn.2d at 518.

The use of "may" in statutory language indicates the legislature intended the provision to be directory or advisory, while its use of "shall" is mandatory. *Erection Co. v. Dep't of Lab. & Indus.*, 121 Wn.2d 513, 519, 852 P.2d 288 (1993).

In an appeal from a superior court's decision in a worker's compensation case, we review the superior court's decision, not BIIA's decision. RCW 51.52.140; *Rogers v. Dep't of Lab. & Indus.*, 151 Wn. App. 174, 179-81, 210 P.3d 355 (2009).

2. *RCW 51.08.178(1) Unambiguously Allowed DLI to Average the Number of Hours Carlson Worked Per Day*

Carlson contends that the use of "may" in the following sentence from RCW 51.08.178(1) makes the statute ambiguous and thus subject to liberal statutory interpretation in his favor. "The number of hours the worker is normally employed shall be determined by the department in a fair

8

and reasonable manner, which *may* include averaging the number of hours worked per day."
RCW 51.08.178(1) (emphasis added). We disagree.

To determine whether DLI appropriately calculated Carlson's hours, we examine the plain meaning of the statutory terms. *See Columbia Riverkeeper*, 188 Wn.2d at 432. Here, the meaning of the contested phrase in the statute is plain on its face and unambiguously states that DLI "may" average the number of hours a worker has worked per day in calculating the number of hours the worker is normally employed. The legislature's use of "may" indicates its intent that the passage is directory or advisory, not mandatory. *Erection Co.*, 121 Wn.2d at 519. The legislature's use of "may" allows DLI to use its discretion when determining the number of hours a worker is normally employed per day. *See id.*

Carlson's hours worked per week during the period were undisputed and his weekly hours varied between 24 to 40 hours. The payroll records reflected neither Carlson's number of hours worked per day nor the number of days worked per week. In the absence of an agreement between the parties or evidence regarding Carlson's number of hours "normally employed" per day and number of days "normally employed" per week, DLI averaged Carlson's total hours worked in a representative six-month period, during which he worked for Tradesmen on one assignment at Fairbanks.[3] DLI believed this calculation method to be fair and reasonable, and it resulted in an average of monthly hours normally employed. Under DLI's monthly wage calculation, the number of days or hours Carlson normally worked could change per week, consistent with Carlson's number of days and hours he actually, and thus "normally," worked. In

---

[3] Carlson does not dispute the appropriateness of using the six-month period to calculate his wage rate.

essence, in the absence of the number of hours normally employed per day and number of days normally worked per week, DLI's method totaled the average number of hours Carlson normally worked per day in a monthly period to arrive at Carlson's monthly wage.

Therefore, the plain meaning of "may include averaging the number of hours worked per day" allows DLI to utilize the method it did in determining Carlson's wage rate under these circumstances. RCW 51.08.178(1). And under the statute, DLI had discretionary authority to do so. *See* RCW 51.08.178(1). Because the statute's meaning is plain on its face, we must give effect to that plain meaning as an expression of legislative intent. *Green v. Pierce County*, 197 Wn.2d 841, 850, 487 P.3d 499 (2021); *see Spokane County*, 192 Wn.2d at 458.

Carlson argues that the superior court erred by affirming BIIA's determination that the wage calculation was fair and reasonable because it was contrary to the holdings in *Avundes* and *Tierney*.[4] Carlson cites these cases for the proposition that despite not working 40 hours every week within the six months preceding his injury—given the nature of construction work and his intention to work full time—DLI should calculate his wage rate as if he had worked 40 hours every week. We disagree.

In *Avundes*, our supreme court adopted a two-part test for determining whether a person's employment is essentially intermittent—requiring the application of RCW 51.08.178(2)—looking first to the type of work being performed and second, to the relationship of the worker to the employment. 140 Wn.2d at 287. The court considered four factors to determine Avundes' relationship to his employment—the nature of his work as a general farm laborer, his intent to be a full-time worker, his relation with his current employer, and his work history. *Id*. In *Tierney*,

---

[4] *Harder Mech., Inc. v. Tierney*, 196 Wn. App. 384, 384 P.3d 241 (2016).

the court applied the *Avundes* test in determining that DLI was to calculate Tierney's wage under the default provision, RCW 51.08.178(1). 196 Wn. App. at 397.

Carlson's reliance on these cases is misplaced. Unlike here, the issue in *Avundes* and *Tierney* was whether subsection (1) or (2) should apply to the workers for the purposes of calculating wages. In both cases, to resolve the question of which subsection applied, the courts considered the worker's intent as a relevant factor in determining if the worker's relation to their employment was intermittent. *See Avundes*, 140 Wn.2d at 287; *see also Tierney*, 196 Wn. App. at 389. Some confusion arises because both opinions use the term "full-time," but they use the term to discuss the worker's relationship to their work, signaling application of subsection (1), and not subsection (2), which governs essentially intermittent or part-time employment.

Here, the parties do not dispute that subsection (1) applies and that Carlson is not an intermittent worker subject to subsection (2). Indeed, for the purposes of Carlson's worker's compensation claim, DLI determined Carlson was a "[s]ub[section] 1, regular and continuous worker" as opposed to a "part time, intermittent, or seasonal worker," and calculated his wage rate under RCW 51.08.178(1), consistent with *Avundes'* and *Tierney's* determinations that the workers were subsection (1) workers. CP at 261. Under the circumstance here, *Avundes* and *Tierney* are not availing.

Next, Carlson submits that Title 51 RCW must be construed liberally in favor of injured workers, and DLI should average hours worked only when it benefits the injured worker. In his reply brief, Carlson clarifies that RCW 51.08.178(1) is susceptible to more than one reasonable interpretation, making it ambiguous, because "may" indicates a permissive choice as opposed to "shall," which generally indicates a mandatory provision. Reply Br. of Appellant at 6. Carlson cites *Cockle* for the proposition that where reasonable minds can differ over statutory meaning, in

keeping with the legislature's purpose in RCW 51.12.010, the benefit belongs to the worker. *Cockle*, 142 Wn.2d at 758 (holding that the phrase "other consideration of like nature" in RCW 51.08.178(1) is ambiguous because several reasonable interpretations of the phrase exist).

While Carlson contends that the "may" phrase in RCW 51.08.178(1) is ambiguous like the phrase "other consideration of like nature" in *Cockle*, we do not find Carlson's matter similar to *Cockle*. As discussed above, Carlson's contested statutory language is unambiguous, and a statute is not ambiguous simply because other possible interpretations exist. *See Steen*, 151 Wn.2d at 518. And the parties do not dispute the permissive meaning of "may" in the provision at question. We are not persuaded that a conclusion of ambiguity with "other consideration of like nature," requires a similar conclusion of ambiguity with "may" where the legislature clearly gave DLI discretion in this circumstance by use of "may" in the statute.

Additionally, Carlson contends that DLI erroneously interpreted "may" as "must," but Carlson misses the mark. Br. of Appellant at 25. As discussed above, the record did not support any specific number of hours or number of days per week that Carlson normally worked. DLI used the information provided by the parties. Furthermore, DLI does not argue that it "must" average Carlson's hours under RCW 51.08.178(1). DLI averaged hours worked here because it was fair and reasonable based upon the evidence presented.

RCW 51.08.178(1) allows DLI some flexibility in determining worker wages when they are not fixed by the month. The record provides Carlson's total number of hours worked per week and his hourly salary. From that evidence, DLI could not reasonably determine the number of days Carlson was normally employed per week and the number of hours he was normally employed per day to apply RCW 51.08.178(1)(a)-(g).

Carlson argues that DLI should have calculated his wage based on full-time work of 160 hours per month, or 40 hours per week, and that to do otherwise harmed him contrary to the legislature's intent. Carlson submits that he "worked essentially full time and intended to work full time," so DLI should have applied subsection (1)(e)—the daily wage multiplied by twenty-two if the worker was normally employed five days a week. Reply Br. of Appellant at 6. However, RCW 51.08.178(1) does not use the term "full-time" or define full-time work as 40 hours per week.[5] Even if the legislature intended full-time work to be 40 hours of work per week, it does not express that within RCW 51.08.178(1), and we will not add language to an unambiguous statute. *See Am. Cont'l.*, 151 Wn.2d at 518.

Thus, under RCW 51.08.178(1) and these circumstances, DLI had discretionary authority to average Carlson hours worked to compute his wages. The superior court did not err by affirming BIIA's determination that it was fair and reasonable for DLI to average Carlson's hours in reaching Carlson's wage at the time of his industrial injury.

## ATTORNEY FEES

Carlson requests attorney fees and costs on appeal pursuant to RCW 51.52.130. Under RAP 18.1(a), we may award a party its reasonable attorney fees if an applicable law grants a party the right to recover them. Under RCW 51.52.130(1),

> If, on appeal to the superior or appellate court from the decision and order of the board, said decision and order is reversed or modified and additional relief is granted to a worker or beneficiary . . . a reasonable fee for the services of the worker's or beneficiary's attorney shall be fixed by the court.

---

[5] Notably, for subsection (1)(e) to apply, Carlson would have had to show he normally worked five days per week. The record does not support that he normally worked five days a week. If, for example, Carlson had normally worked four days per week at 10 hours per day (to arrive at 40 hours) then subsection (1)(d) would have applied.

No. 59469-2-II

Because we affirm the superior court's decision that DLI properly calculated Carlson's wage rate, Carlson is not entitled to reasonable attorney fees. Thus, we decline to award Carlson's request for attorney fees and costs on appeal.

CONCLUSION

We hold under RCW 51.08.178(1), DLI had discretionary authority to average Carlson's hours to compute his wage rate. Accordingly, we affirm. We decline to award Carlson's request for attorney fees and costs on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Che, J_
Che, J.

We concur:

_Glasgow, J_
Glasgow, J.

_Veljacic, A.C.J._
Veljacic, A.C.J.

14